**GRAMATAN–SULLIVAN, Inc.,
Appellant,**

v.

**Nathan KOSLOW, Appellee.
No. 47, Docket 24140.**

United States Court of Appeals
Second Circuit.

Argued Oct. 9, 1956.

Decided Jan. 7, 1957.

Francis J. Duffy, Prime Brothers & Duffy, Yonkers, N. Y., for plaintiff-appellant.

Ralph Stout, Benjamin Jaffe, New York City, for defendant-appellee.

Before CLARK, Chief Judge, and HAND and SWAN, Circuit Judges.

HAND, Circuit Judge.

The plaintiff, a New York corporation, appeals from a judgment in its favor, awarding a part only of its claim against the defendant, a citizen of New Jersey: the jurisdiction depends upon this "diversity" of citizenship. The plaintiff's claim arises because of an alleged diversion to the defendant of a "trust" fund which a New York corporation, A. Shaw & Co., Inc., should have held for the payment of the plaintiff's claim against it. The complaint alleged that the "trust" arose under § 36–a of the Lien Law of New York, McK.Consol.Laws, c. 33, because of the following facts. A. Shaw & Co., Inc., is a building contractor, and had entered into a contract to construct the masonry needed for an "improvement" upon real estate in Dobbs Ferry, New York. Although the plaintiff had no contract with the contractor, upon the contractor's orders it from time to time furnished sand and mortar needed on the job as it went along; so that, when the contractor abandoned performance of the contract at the end of August 1954, it owed the plaintiff more than $33,000. The contract provided for interim payments each month by the owner as the work progressed, two installments of which make up the fund in dispute, which the contractor received in May and June 1954, and which it turned over to the defendant in payment of loans by him for money used to finance the job. At the time of these two payments the contractor owed the plaintiff only $321.60, and it is to that amount that Judge Palmieri limited the plaintiff's recovery, instead of awarding it the whole of the two installments. He held that, although § 36–a imposed a "trust" upon all payments made to a contractor, it secured subcontractors only to the extent of their claims at the time when the payments were made, and that the contractor was not therefore obliged to retain interim payments intact as a "trust" until the completion of the job. It was from this limitation of its recovery that the plaintiff appeals.

The first question is whether the contractor was an "indispensable" party, jurisdiction over which was a condition upon the validity of any judgment herein. The plaintiff made it a party defendant in the original complaint but struck it out by amendment, because, like the plaintiff, it was a New

York corporation and its presence defeated the "diversity" jurisdiction of the court. It is clear that the contractor has no personal interest in the outcome of this action, because if the plaintiff succeeded, the payments made by the defendant would *pro tanto* reduce its debt to the plaintiff and would at most revive the defendant's claim against it, thus merely changing one creditor for another. Ordinarily, "indispensable" parties are those whose presence is necessary to protect them from injustice to them that will arise out of the judgment. The defendant does not press that objection here; instead he argues that it is he, and not the contractor, who would have been prejudiced by a full recovery, because although that would revive his debt against the contractor, in an action to collect it, he would not have the benefit of an estoppel upon the issue whether the payments had been made out of interim payments by the owner. It is impossible to take this argument seriously as a basis for holding that the court was without jurisdiction to decide the action at bar. In an action by the defendant to collect his debt against the contractor, it is the contractor which would have the burden of proving the payments, which were in fact made by endorsing to the defendant cheques of the owner. Certainly, as soon as that appeared, it became evident that the defendant could be under no handicap upon meeting a defense that the contractor had paid its debt out of funds not derived from the owner. We agree, therefore, that the court had jurisdiction under Fed.Rules Civ.Proc., Rule 19(b), 28 U.S.C.A., to proceed without the presence of the contractor, and we reach the merits.

The plaintiff's position is that § 36–a makes all interim payments on a building job a trust fund, not only for the benefit of existing claims of "subcontractors," but of future claims that may arise thereafter as the work progresses. The contractor must keep intact all such payments save that he may pay claims of other "subcontractors" as they fall due. If he uses the payments for any other purpose, he is guilty of larceny, and anyone who receives them is liable, at least civilly to "subcontractors," present and future, if he knows, or is charged with notice, that what he receives is part of an interim payment. For this interpretation the plaintiff especially relies upon a report of the New York Law Revision Commission, submitted to the legislature on December 11, 1941, which presumably resulted in the amendment of § 36–a and which for the first time expressly granted a civil remedy for breaches of the trust. This report did indeed twice say that "it would seem" that the trust was for the benefit of future, as well as existing, claimants; and, although such a guarded statement was not a categorical ruling, but apparently tentative, we will assume *arguendo* that it is authoritative. The issue at bar does not, however, turn on whether or not the trust is for the benefit of future, as well as of existing, claims; it depends upon whether the contractor has any privilege to use the payments, pending the completion of the work, and the existence of such a privilege is not necessarily a consequence of recognizing future claimants as beneficiaries. The privilege to pay claims as they mature, itself shows that the trust is not of the usual kind, for its exercise may result in giving earlier claimants a preference over later: e. g. if the contractor fails to earn any later payments. However, that privilege would not justify a privilege to use the payments for the contractor's own purposes, had not the section declared that a contractor is guilty of larceny, if he not only fails to apply the payments to the "claims of subcontractors" but that he also "fails to pay the claims." In short, if he pays the claims from other resources, he is not guilty of larceny, though he has used the payments for other purposes. It is a necessary condition upon his guilt that he shall be in default in the payment of the claims and it follows that he cannot be guilty as to claims that have not matured—certainly not as to claims not

yet even in existence. No doubt, that exposes "subcontractors" to the risk of the contractor's continued solvency before their claims mature, but it does not deny them protection as soon as they do. Moreover, this does not appear to us an unreasonable compromise between the possible necessities of the contractor, and the protection of "subcontractors" considering the fact that a criminal sanction was being imposed.

At any rate, whether or not as a new proposition that is the correct interpretation of the language, the Court of Appeals adopted it in Raymond Concrete Pile Co. v. Federation Bank, 288 N.Y. 452, 43 N.E.2d 486. When that case was in the Appellate Division, 261 App.Div. 25, 23 N.Y.S.2d 933, the critical issue was that "[R]easonable inquiry on the part of the bank undoubtedly would have disclosed the fact that L. P. O'Connor, Inc., would be unable to pay its subcontractors on February 20th, if, as was done in this case, the sum of $78,000 was deducted from the face amount of the check" received from the owner, 261 App.Div. at page 28, 23 N.Y. S.2d at page 936. However, in the Court of Appeals, the plaintiff apparently made an added argument, 288 N.Y. at page 458, 43 N.E.2d at page 489: that is, that "irrespective of any denial of actual knowledge, since the bank benefited by the diversion, it is subject to the requirements of the law to restore to the trust the funds which it received for its personal benefit." To this the court answered: "There is no evidence in the case whether or not the bank made any inquiry to determine if there were in existence any beneficiaries of the fund when the offset was made," and then went on as follows, 288 N.Y. at page 459, 43 N.E.2d at page 489: "The most that the statute does or was designed to do * * * is to create the possibility of a fiduciary relationship arising between the contractor * * * and a possible subcontractor * * *. The statute does not give rise to a fiduciary relationship * * * or, if once created, continue it under any and all con-

tingencies. Whether the moneys * * are or may be the subject-matter of a trust depends exclusively upon the fact, * * * that the contractor fails to pay the claims mentioned in the section. Nothing in the section bars the contractor from using the moneys received for any purpose he may see fit provided he does not fail to pay all such claims out of other moneys which he may then have or which he may afterwards receive, * * * There is no evidence in the case to indicate that the defendant knew or had any reasonable grounds to suspect prior to February 23, 1939, either that the plaintiff was a subcontractor * * * or that it had any claim at any time * * *. Without such evidence, there was no basis in the record for the judgment requiring defendant to return the moneys * * *." Finally, 288 N.Y. at page 462, 43 N.E.2d at page 491: "In clear terms those sections were not intended to create a real trust fund to remain such under any and all contingencies from the time the contractor or subcontractor first received payment * * *."

Thus the Court of Appeals did not think that the bank was put on notice as to whether there might be outstanding claims; it had no duty to inquire. The defendant's position in the case at bar is much stronger than the bank's in that action, for an inquiry would have shown that there were no existing claims whatever except that for which the plaintiff has recovered. If the plaintiff is to recover more, it can only be because it is a breach of trust for the contractor while the work is progressing to use any of the payments for his own purposes before the job is completed. That might have been the meaning but it was never expressed.

We have hitherto been discussing § 36–a before its amendment in 1942, and we understand that the defendant argues that this changed the scope of the liability theretofore imposed. However, the section remained as before, word for word, except for the

addition of two sentences: one, granting a "civil action" to enforce the trust regardless of a "subcontractor's" failure to file any lien; and the other providing that the trust funds shall include the right of action "upon an obligation for moneys due or to become due to a contractor." We can find no basis in those changes for supposing that more was intended than to attach the civil sanction to the same liability to which the criminal sanction already attached. It would be an unwarranted construction of the change to suppose that, although the criminal liability remained subject to the former condition that the contractor "fails to pay the claims," the civil liability was relieved of that condition. Finally, we submit that the validity of a payment by a contractor to a third person must depend upon the situation as it exists when the payment is received: that is, the payee does not hold it subject to a condition subsequent that the contractor shall pay at their maturity upon future claims as they may arise as the work progresses. If invalid, it is invalid at once; any other construction would make the section a trap for those who dealt with the contractor. It is fair in this connection to remember that the Court of Appeals as part of its reasoning for holding that the unamended section imposed no civil sanction said, 288 N.Y. at page 463, 43 N.E.2d at page 491: "Though section 23 requires a liberal construction of the provisions of the Lien Law, it does not authorize judicial amendment so as to enlarge its clearly defined scope and purposes."

Judgment affirmed.

CLARK, Chief Judge (dissenting).

We have before us for construction important New York remedial legislation for the protection of laborers and materialmen on building jobs. The evil aimed at is that of "pyramiding," whereby a contractor parlays his speculations, using one undertaking as the basis of credit expansion for another, with lenders and security holders pretty well protected until, on ultimate disaster, those contributing labor or materials to a particular job are left holding an empty bag. And the remedy is the trust device first introduced in 1929 and now perfected by legislation of 1942, drafted, nurtured, and supported with complete documentation by that most distinguished embodiment of effective law reform, the Law Revision Commission of the State of New York. It is a matter of profound regret that my brethren have denigrated that source of precise and persuasive legislative history—so different from the usual confusion which such history tends to engender—which the Commission's records afford. Rather, taking some vague judicial remarks on earlier legislation, they have reacted against what is thought to be unduly harsh (more accurately, stern) measures against contractors and have fashioned a wholly original construction of the statute which substantially guts it in its immediate application here. And that, federal judges should not do to state law.

The conclusion herein reached is based on a construction of the crucial statute, N.Y.Lien Law § 36–a,[1] which denies to plaintiff, a supplier of materials on the

1. This is that one of the several trust fund sections recommended by the Law Revision Commission which is immediately pertinent here. It reads as follows:

"§ 36–a. Contractor who diverts funds guilty of larceny; *civil remedy to enforce trust.* The funds received by a contractor from an owner for the improvement of real property are hereby declared to constitute trust funds in the hands of such contractor to be applied first to the payment of claims of subcontractors, architects, engineers, surveyors,

laborers and materialmen arising out of the improvement, and to the payment of premiums on surety bond or bonds filed and premiums on insurance accruing during the making of the improvement and any contractor and any officer, director or agent of any contractor who applies or consents to the application of such funds for any other purpose and fails to pay the claims hereinbefore mentioned is guilty of larceny and punishable as provided in section thirteen hundred and two of the penal law. *Such trust may be en-*

particular improvement here involved, the intended benefit of the trust defined by the statute. But I am convinced that the plaintiff is correct in claiming such benefit; and for demonstration thereof I shall rely on the Commission's scholarly "Act, Recommendation and Study relating to the Trust Fund Provisions of the Lien Law," 271–336 (1942). I note that the detailed supporting Study, 295–336, was prepared under the direction of that eminent scholar, Professor John W. MacDonald, who long served as Executive Secretary and Director of Research of the Commission and who has just now been honored by appointment to the Commission itself. Quite properly I should incorporate all this material with its voluminous annotations in this opinion, but it may be sufficient to give its flavor by briefer citation and quotation. The Commission summarized the existing law (1941) thus:

"Legislation has been enacted in New York and several other states to prevent abuses which frequently arise in the pyramiding of building operations and to afford adequate protection to those who contribute services or materials upon an improvement of real property.[2]

---

*forced by civil action maintained as provided in article three-a of this chapter by any person entitled to share in the fund, whether or not he shall have filed, or had the right to file, a notice of lien or shall have recovered a judgment for a claim arising out of the improvement. For the purpose of a civil action only, the trust funds shall include the right of action upon an obligation for moneys due or to become due to a contractor, as well as moneys actually received by him."* (The italicized words were added in 1942.)

Art. 3–A, entitled "Enforcement of Trusts [New]," contains the seven sections now appearing as N. Y. Lien Law, §§ 70–76. See "Note of Commission" referred to in note 12 infra.

2. The following vivid description of the current abuses was quoted in the Study, 1942 Rep.N.Y.Law Revision Commission 298, 299, from Levitt's Guide to the Mechanic's Lien Law and Conditional Sales Law (written and published at the instance of The Association for the Revision of the New York State Lien Law, 1930) ¶279, pp. 149–150:

"For years our larger centers of population harbored, and in fact, nurtured a type of builder and contractor who thrived on operations commenced by them but never completed by them. A builder of that type, after commencing an operation, adopted the practice of mortgaging such operation far beyond the value of his equity, before the contractor, materialman or subcontractor (intent only upon performing his contract, with no time or facilities for continuous searching or superhuman vigilance), realized his position. It must be noted that even care of an inconceivable nature, never prevented an overnight mortgage. Such builder would pocket the proceeds of these mortgages, while the men who contributed their material and labor, and made possible the very security for such mortgages, would be left holding the proverbial 'empty bag.' In fact, legitimate financial institutions unwittingly aided and abetted such unscrupulous builder by permitting him to divert even the building loan money. Time and again, such institutions learned to their sorrow, that the cost of completing an operation abandoned by such a builder, was greater than the amount named in the building loan mortgage.

"a—The honest builder, likewise, suffered by reason of the foregoing tactics, in that the honest builder found that he could not compete with one evading the payment of material and labor in the construction of a building. The honest builder, paying for an operation, could not, in selling the operation, compete with one who at times paid only about 25% of the cost.

"b—In the last analysis, even the dishonest builder, and may we say at this time, that a number of such builders may have been merely improvident, came to grief. The opportunity for diverting large sums of money with impunity, engendered a habit of pyramiding or mushrooming operations. By 'pyramiding' or 'mushrooming' we mean the use of mortgage monies from one operation for the purchase of additional land and the erection of buildings in other operations, thereby adding link upon link to this vicious chain. The concomitant result of such practice is now a matter of history. The deplorable condition in which the building trade now finds itself is directly traceable to that source—pyramiding—mushrooming. The dishonest or improvident builder found himself possessed of a host of buildings, but at the same time,

Such legislation is based on the principle that funds received for an improvement should be applied to pay the cost of that improvement. It supplements the older remedy by lien upon the property improved, which is not available after all payments by the owner on his contract for the improvement have been made.[3]

"The first legislation was enacted in this state in 1929 at the time of the general revision of the Lien Law. It required that building loan mortgages contain a covenant by the owner to hold the moneys received thereunder as a trust to be applied first to the cost of improvement. Moneys so received were declared to constitute trust funds, a diversion of which was made punishable as a misdemeanor. Later the trust concept was extended to include moneys received by a contractor or subcontractor on account of an improvement, or upon an assignment of moneys due or to become due on a public improvement, as well as moneys received by an owner on a mortgage or conveyance, and proceeds of insurance on the improved property whether payable to an owner, contractor or subcontractor. Some of these statutes provide for the creation of a trust by covenant; others expressly declare the existence of a trust. Diversion of any such trust funds is now punishable as larceny." 1942 Rep.N.Y.Law Revision Commission 283.[4]

The Commission, to end widespread uncertainty concerning interpretation of the existing provisions, recommended legislation clearing up items of doubt.

The critical part of the Commission's work for purposes of this case concerned the scope of the trust fund. Thus it approved the view urged unsuccessfully by the present plaintiff—that all money paid or owing to the contractor for work on one improvement constituted a single trust res for the benefit of all those who worked on that improvement. This idea of a single trust for a single improvement permeates every page of the official report. Nowhere in the study do the authors suggest the construction adopted by my brethren—that each installment payment constitutes a separate trust fund for the benefit of those who worked on the improvement prior to the payment of that installment. Nowhere in the comprehensive report is there discussion of the intricate problems of statutory construction and judicial enforcement raised by the novel gloss upon the statute here advanced.

So the explanation in the Study of the time when the trust arises is couched in terms which cannot be squared with our present opinion:

"Closely allied to the problem of who are beneficiaries of the trust is the question as to when the trust arises. While it is elementary that there can be no trust without a beneficiary, the beneficiary may be designated by class rather than by naming specific individuals. Future members of the designated class may enjoy the benefits of a trust. It would seem that the trust arises as soon as the trustee desig-

tottering on the brink of ruin. The writer has interviewed many such builders, who, with tears in their eyes, confessed that if the law, now in force, had been on our statute books a year or two ago, they would now be men of substance, owning soundly financed buildings, which could be carried even during a falling market."

The author then stresses the penalizing of legitimate contractors unable to "meet the competition of these fly-by-nights, whose estimates did not include payment in full for material and labor," the burden on the renting public, the overproduction of buildings, and the express legislative

intention that funds borrowed on the strength of an improvement should "reach its ultimate destination—material and labor—before such funds are taken by way of profits either by the owner, contractor or subcontractor."

3. This is still true. See Friedman, Protecting the Equitable Lien of the Subcontractor and Materialman, N. Y. L. J., Oct. 30, 1956, p. 4, and Oct. 31, 1956, p. 4.

4. For fuller description of the various legislative steps after 1929 in refining the trust fund concept, see Study, 1942 Rep.N.Y.Law Revision Commission 300.

nated in the provision receives the fund, and that such trustee is a resulting beneficiary, who is entitled to any remainder of the fund after it has been distributed to claimants entitled to share in it. The trust would continue until all claims for services and material on the improvement (by the classes designated in the statutory provision) have been paid. It would seem that even if no such claimant existed at the moment of receipt of the moneys by the contractor (or other trustee as designated in the trust fund provisions) a trust would arise in favor of future claimants (*i.e.*, members of the classes for whose benefit the provisions were enacted). The contractor, subcontractor or owner, who is trustee, is in a position to know or to determine whether all claims are paid, and if they are not paid, he is also in a position to know it, even in absence of the requirement that claimants must file a lien to share in the trust fund, or in the case of non-lienable claimants, in absence of the claim being reduced to judgment. If, however, the filing of a notice of lien is requisite to establish a claimant as a beneficiary, it would seem no trust would arise, unless such notice were filed before the fund passed out of the possession of the contractor (or other trustee designated by statute). Moneys transferred by the contractor before the filing of a notice of lien would be taken free of a trust, the trust having failed for lack of any beneficiary, *i.e.*, lienor of the classes designated who filed notice of lien before the fund left the contractor's hands." 1942 Rep.N.

Y.Law Revision Commission 325, 326.

The study group thus concluded that the interpretation urged by the plaintiff here was correct unless claimants were required to file notice of lien to qualify as beneficiaries. This idea had appeared in one Appellate Division case [5] and was followed by us in our first opinion in Wickes Boiler Co. v. Godfrey-Keeler Co., 2 Cir., 116 F.2d 842. The Commission took great pains to wipe out these two decisions which had cast doubt on what it considered the proper construction of the statute. It criticized them by name in the Report explaining the proposed amendments,[6] and it recommended that the various trust fund sections of the Lien Law be amended by the addition of the words: "Such trust may be enforced by civil action maintained as provided in article three-a of this chapter by any person entitled to share in the fund, whether or not he shall have filed, or had the right to file, a notice of lien or shall have recovered a judgment for a claim arising out of the improvement." [7] The Legislature passed the amendments as requested, thus ratifying the Commission's construction of the statute and rejecting the contrary interpretation of the first Wickes Boiler Co. case. It may be noted that we had already felt constrained to change our view there announced in our opinion on rehearing, Wickes Boiler Co. v. Godfrey-Keeler Co., 2 Cir., 121 F. 2d 415, certiorari denied Godfrey-Keeler Co. v. Wickes Boiler Co., 314 U.S. 686, 62 S.Ct. 297, 86 L.Ed. 549.

My brethren nevertheless adopt a construction of the amended statute which wars with its language, its legislative history, and New York case law,[8] and

5. New York Trap Rock Corp. v. National Bank of Far Rockaway, 260 App.Div. 1035, 24 N.Y.S.2d 426, affirmed 285 N.Y. 825, 35 N.E.2d 498.

6. 1942 Rep.N.Y.Law Revision Commission 283, 284.

7. 1942 Rep.N.Y.Law Revision Commission 287.

8. Significantly, the two New York cases cited by the majority, People v. Kew Gardens Terrace, Inc., Co.Ct., 38 N.Y.S.2d 246, and Raymond Concrete Pile Co. v. Federation Bank & Trust Co., 288 N.Y. 452, 43 N.E.2d 486, both involved the construction of the trust fund sections as they appeared before the 1942 amendments. In Metropolitan Casualty Ins.

which clashes with other parts of the statutory scheme. In their view each installment payment by the owner to the contractor constitutes a separate trust *res* for the benefit of the men who worked on the improvement prior to the moment of payment. In the present case they decided that the owner's checks which the general contractor received after the plaintiff worked on the job may be traced into the defendant's hands, but that the checks received by the contractor for this same improvement before the date on which plaintiff started work are not held for plaintiff's benefit. The time at which a contractor receives an installment payment from the owner is now a critical fact in determining the rights of different claimants to the trust fund, although the trust fund may include money which is never paid by the owner to the contractor.[9] My brethren ignore the result of their construction: preferring laborers who do the first stages of construction, such as digging the foundation, over the men who do the last parts of a job, such as painting the interior. The former group of workmen can presumably look to all subsequent installment payments for security, while the last group has but one payment against which they can proceed.[10] The necessary effect of this decision is that ordinarily the early installment payments will never help the statutory beneficiaries, even though those beneficiaries do not have adequate satisfaction from later installments.[11]

The administrative complexity of my brothers' plan is enough to condemn it. To avoid criminal liability a contractor must not divert an installment check

Co. of New York v. Barr Wrecking Corp., Sup., 40 N.Y.S.2d 607, Justice Froessel explained the difference between the statute before amendment construed in the Raymond case, supra, and the statute under its present wording. Subsequent New York cases have recognized that the 1942 amendments strengthened the trust fund provisions and overruled earlier decisions. E. g., Ridgefield Supply Co. v. Rosen, 1 Misc.2d 675, 147 N.Y.S.2d 337; In re Einach's Estate, 1 Misc.2d 537, 146 N.Y.S.2d 240; Waldman v. D. & V. Plumbing & Heating Contractors, Sup., 102 N.Y.S.2d 787; Wade v. Nassau Suffolk Lumber & Supply Corp., 275 App. Div. 864, 89 N.Y.S.2d 294; Application of Rafuse, Sup., 82 N.Y.S.2d 3, affirmed 274 App.Div. 944, 83 N.Y.S.2d 654; Rosicato v. Manera, 192 Misc. 607, 81 N.Y.S.2d 353.

9. The last sentence of the amended § 36–a makes moneys owed but unpaid by an insurer or owner part of the trust *res.* See note 1 supra. Sec. 13(7) of the N.Y.Lien Law makes advances from the lender to whom the contractor assigned his contract part of the trust fund.

10. The majority opinion does not make clear whether men who do the early stages of work have recourse only to the installment which immediately follows their work or whether they can look to all subsequent installments. If the former is the case, the one installment may be so burdened with creditors' claims that statutory cestuis get less than 100 cents on the dollar, while the next installment is so lightly taxed that nonbeneficiaries can enjoy diverted trust funds. An unscrupulous owner and contractor can time the payment of installments to help the lender at the expense of the cestuis.

If, on the other hand, the men who dig the foundation can look to all subsequent payments for security, they have a preference over painters, who could look only to the last installment. Making each payment a separate trust cannot fail to breed anomalies, since it makes cases turn on the happenstance of whether the owner's check arrived before or after a materialman performed.

11. This is most obvious where the owner pays an installment in advance and there are no materialmen who have worked prior to the payment of that installment. It is also true in the present case where the contractor borrowed money to pay the men who did the early stages of work on the improvement. These men were paid from borrowed money, and the first installment check was diverted to the lender. But from the next installment check the contractor was obliged to pay both the lender and the second group of materialmen which led to his default. Upon the default only the second group of materialmen needed recourse to the trust funds, the first group having already been paid. But under my brothers' rule, the first installment is for the exclusive enjoyment of the earlier group; and since they do not claim it, it may be diverted to nonbeneficiaries such as the lender.

to a nonbeneficiary unless he is sure that all persons who performed during the time period covered by that check will be satisfied. To know whether a check may be paid to a nonbeneficiary the general contractor must now ascertain at his peril the precise claims of subcontractors, materialmen, laborers, insurers, and sureties which arose in the period covered by that installment check. I doubt if he will feel more free to use the check than he would had the plaintiff's construction of the statute been adopted.

So, too, the present decision means that in enforcement proceedings the plaintiff must prove the timing of each installment payment and the claims which are properly allocated to it—perhaps years after the event. Not only must he prove the *total* claims of each statutory beneficiary, but he must now also break down the claims and allocate them to the correct installment payments—an unnecessary addition to the length and complexity of the proceedings. It remains to be seen whether such expensive litigation will be attempted by the persons whom the Legislature tried to help—workmen with small unsecured claims.

These amendments were the careful work of skilled draftsmen who had analyzed the prior statute and cases. They were adopted without change by the Legislature so that the Commission's consistent scheme was not marred. Introducing new wrinkles at this late date causes nothing but mischief.

The statute's natural reading is that all moneys paid or owing to the contractor for one improvement constitute a single trust fund for the benefit of men who worked on that improvement, and the manner and timing of the installment payments to the contractor are quite irrelevant. My brethren mention that here the owner had agreed to pay the contractor in installments as the job was completed, But not all contractors are paid in that fashion; it is hardly proper to construe the statute as leading to variable consequences as the owner and contractor alter their scheme of payments. These two parties are both strangers to the class of persons the statute is designed to protect, and nothing in the background suggests that their chance arrangements should control the scope of the trust fund.

My brethren cite Raymond Concrete Pile Co. v. Federation Bank & Trust Co., 288 N.Y. 452, 43 N.E.2d 486, as requiring this result. Even if that case supported the defendant's view, it would not help us here, inasmuch as the case involved the original trust fund provisions before the critical 1942 amendments. Since the opinion of the Court of Appeals was filed after the Law Review Commission completed its work,[12] the Commission had no opportunity to say how much of that opinion remained good law after passage of the amendments. The Commission did approve the Appellate Division result,[13] however, which the Court of Appeals reversed. The first ground of the final opinion— that the trust fund sections are only criminal and not civil—was clearly overruled by the amendments. The second ground—that funds cannot be traced into the hands of third persons who received them without notice of their trust character—was approved by the Commission[14] and is still good law. But it does not bar recovery by the plaintiff in this case where the trial court carefully documented its finding that the

12. The case was decided July 29, 1942. The amendments were passed May 11, 1942. See Metropolitan Casualty Ins. Co. of New York v. Barr Wrecking Corp., Sup., 40 N.Y.S.2d 607, and the history of the amendments in the Assembly given in 1942 Rep.N.Y.Law Revision Commission 773, also id. 789, 790, setting forth

the note defining the origin and purpose of the legislation which now appears as "Note of Commission" preceding N.Y. Lien Law § 70.

13. 1942 Rep.N.Y.Law Revision Commission 316.

14. 1942 Rep.N.Y.Law Revision Commission 315–317.

defendant had notice that the moneys he received were diverted trust funds.[15]

The full remarks of the Court of Appeals show that it never approved the result we reach today. Its opinion was carefully sprinkled with such words as "on the pleadings and the proof as presented," "There is no evidence in the case to indicate that * * *," "Without such evidence, there was no basis in the record for the judgment * *," "In the circumstances disclosed by the record * * * "—which show that the result turned on insufficient proof of notice, and not on this novel construction of the statute.

The judicial hostility to the trust fund provisions, which we are evincing, but which have been conspicuously absent in the state decisions under the amended statute,[16] seemingly stems from fear that the trust fund concept will prove too restrictive. Where third persons are being sued to recover diverted funds, the potential hardship of the statute is controlled by the requirement that the defendant have received the funds with notice of their trust character.[17] As to contractors' liability, the stern effect may be greatly exaggerated. My brethren suggest that the plaintiff's reading of the statute would require contractors to husband all payments until the end of the job. But the Commission noted that the contractor may use the fund with impunity to pay any person who falls in one of the statutory classes.[18] And the funds may be safely diverted to nonbeneficiaries, as the Court of Appeals observed,[19] just as long as the contractor eventually paid the statutory classes out of other moneys. The contractor will face the danger of criminal liability only if he diverts trust funds without knowing how he is going to pay his materialmen and subcontractors. In other words the statute prevents "pyramiding."

The record in the present appeal suggests that pyramiding still occurs in New York, and that persons like the plaintiff still need protection. The earlier state cases, down through the Raymond decision, did evince sufficient hostility to require the careful corrective provisions developed so ably by the Law Revision Commission. I suggest that it is to say the least anomalous for us now to take up the cudgels for the pyramider and raise obstacles to the enlightened Commission and legislative program which have never occurred to the state courts.

I think we should reverse and remand for further proceedings, as herein indicated.

---

15. Palmieri, J., at D.C.S.D.N.Y., 143 F. Supp. 641, 646, 647.

16. Cases cited supra note 8.

17. 1942 Rep.N.Y.Law Revision Commission 315.

18. 1942 Rep.N.Y.Law Revision Commission 328, 329.

19. Raymond Concrete Pile Co. v. Federation Bank & Trust Co., 288 N.Y. 452, 459, 43 N.E.2d 486.