Robert L. TUCKER, Joyce Banks, Will McGaughy, Napoleon Haney, Laurel Prussing, Joan M. Clark, Ousley H. Walker, Carolyn Toney, Joseph Belman, President of the Illinois Hispanic Council, Joliet Chapter, Richard J. Walsh, President of the Illinois State Federation of Labor, AFL–CIO, and James Clarin, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE, Robert A. Mosbacher, as Secretary of the United States Department of Commerce, Michael R. Darby, as Under Secretary for Economic Affairs of the United States Department of Commerce, Bureau of the Census, George H.W. Bush, as President of the United States, and Donnald K. Anderson, as Clerk of the United States House of Representatives, Defendants.

No. 90 C 1724.

United States District Court,
N.D. Illinois, E.D.

March 12, 1991.

---

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This proposed class action has wended a tortuous path through the district court, passing through three separate courtrooms during which time the defendants filed a motion to dismiss, before finally landing here. The parties briefed the motion to dismiss, but this court determined that it would be premature to consider that motion without having first decided whether to certify the proposed class. The parties subsequently briefed that question and the court is now prepared to rule on each issue.

### 1. Background

Plaintiffs filed this action seeking injunctive relief against the Census Bureau, among others (the court will refer throughout this opinion to all the defendants, collectively, as the Census Bureau or the Bureau). The plaintiffs allege that they, and many others similarly situated, have been and will be, in the absence of judicial intervention, "chronically undercounted" in the decennial census of 1990. They include in the category of "chronically undercounted" racial and ethnic minorities including African–Americans and Hispanics; documented and undocumented aliens; homeless people; people who do not read or speak English well; and people living in poverty or in high-crime areas in both urban and rural communities. Plaintiffs allege that, as a consequence of the Census Bureau's failure to adequately count them, their right to political representation at federal, state and local levels has been impinged. Furthermore, the inaccurate count harms all of Illinois (they do not make any allegations

about the existence of "chronically undercounted" people in other states) since, they allege, a great deal of federal financial aid is allocated on the basis of the census count.

Plaintiffs want the Census Bureau to promise to take measures to correct the anticipated undercount in the 1990 census.[1] The Census Bureau attempted to settle litigation pending in the Eastern District of New York (*New York v. U.S. Dept. of Commerce*)[2] by promising to consider whether to make statistical adjustments for an anticipated undercount. On March 12, 1990, pursuant to the settlement, the Bureau released the Guidelines which would govern its decision on the matter. The plaintiffs think those guidelines will not adequately correct the undercount they anticipate and they want this court to certify a class of plaintiffs and order the Census Bureau to take various measures to correct the anticipated undercount in the 1990 census. Among other things, they want the Bureau to conduct a post-enumeration survey of at least 150,000 households and use "the most accurate correction methods available" to correct the 1990 undercounts.

### 2. Class Certification

The plaintiffs would like this court to certify a class of "all Illinois residents, or, in the alternative, all Illinois residents residing in census blocks in which members of the 'chronically undercounted'—including Blacks and/or African–Americans, Hispanics, racial and ethnic minorities, documented and undocumented aliens, homeless persons, persons who do not read or speak English [well], and persons living in urban and rural poverty or high-crime areas—reside." This court is obligated, pursuant to Fed.R.Civ.P. 23(c)(1), to decide whether plaintiffs may maintain their suit as a class action "as soon as practicable after the commencement of [the action]." The words "as soon as practicable" mean that the court must decide whether to certi-

---

1. The Census Bureau has released preliminary figures, it has not, however, decided yet whether to correct for a possible over- or under-count.

2. For a discussion of some of the issues raised in that case, see 739 F.Supp. 761 (E.D.N.Y.1990).

fy the class before it acts on any dispositive motions. *See Bieneman v. City of Chicago*, 838 F.2d 962, 963 (7th Cir.1988). The court therefore ordered the plaintiff to formally move for class certification, and the parties have fully briefed the motion. In accordance with the Seventh Circuit's directive in *Bieneman*, this court will consider the motion for class certification before turning to the motion to dismiss.

Rule 23 furnishes the guidelines which this court must consider in deciding whether to certify a class. It provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Certification is inappropriate unless the court finds that the plaintiffs have met *each* of these requirements. Because the court finds that the plaintiffs have not presented questions of fact or law which would be common to either of the proposed classes, it need not address the remaining Rule 23(a) criteria.

*Common Questions*

■ The second Rule 23(a) question is whether plaintiffs have demonstrated that the significant questions of law or fact which their own claims raise are common to those which would be raised by the proposed class. *See Johnson v. Baldinger*, No. 89 C 2138, slip. op. at 5 (N.D.Ill. April 19, 1990), found at 1990 WL 60713, 1990 U.S.Dist.Lexis 4596. The legal and factual questions plaintiffs raise are: whether they have standing to bring their claims; whether they are entitled to the relief they have requested; and whether their claim that

certain groups of people are "chronically undercounted" is in fact true. Plaintiffs have proposed a class consisting of all Illinois residents, arguing that an inaccurate count of Illinois' population effectively harms everyone in the state, to the extent state and federal benefits are allocated according to the census. That may be true as far as the federal government is concerned. Congress uses the count in deciding how to allocate federal funds among the states—fewer people means fewer dollars for the state as a whole. The count is also used, in comparison with the count of residents of the remaining states, to determine the number of Congressional representatives to which Illinois citizens are entitled.

The plaintiffs' proposition that an undercount hurts everyone in the state is less likely true, however, when the harm in issue is the availability of state resources. An undercount in some census blocks (and plaintiffs allege that the "chronically undercounted" are concentrated in certain specific blocks) benefits residents of other blocks, since they will then receive a bigger slice of the state benefit pie.

Plaintiffs argue that to the extent the interests of residents of other blocks are adverse to plaintiffs', they are illegitimate (no one, argue the plaintiffs, has a legitimate interest in an inaccurate census count, or the benefits they might derive from such a count). While this may be true, it is not an accurate characterization of the interests at stake here. Plaintiffs are seeking a reallocation based upon demographic hypotheses and statistical assumptions which are not universally accepted (indeed, that is why this suit has become necessary). Whether or not plaintiffs are ultimately vindicated, their proposed "correction" of the census data could potentially harm other residents of the state. Those persons' interests are, legitimately, adverse to the plaintiffs'.[3]

---

**3.** The court notes that the people plaintiffs want to include in their proposed class are not the only ones who may have been undercounted in the most recent census. The Chicago Tribune discovered that a serious undercount had occurred in the affluent Lincoln Park area in Chicago. Laurie Goering et al., *Checkup finds*

*Some Didn't Count in Census,* Chicago Tribune, News Section p. 1 (July 18, 1990). The allegations of a national undercount are also widespread, and cover a wide spectrum of socio-economic strata. Indiana alleges that the Bureau missed 7,000 Indiana University students living

■ Plaintiffs have proposed an alternative class which they argue would alleviate this problem. They propose that, if this court declines to certify a class of all Illinois residents, it should certify a class of the residents of the census blocks in which the "chronically undercounted" reside. Those people would be harmed at both the state and federal levels by the alleged undercount.

Plaintiffs' proposal does not entirely solve the problem because plaintiffs have not identified the census blocks in which the "chronically undercounted" reside, nor provided the court with any principled way of deciding which blocks should be included in the category. By plaintiffs' own allegations, the division cannot be made upon the basis of earlier census data, since that data also failed to adequately account for the "chronically undercounted". The plaintiffs have failed to address this fundamental problem of class definition, and the court cannot certify the class unless it is resolved.[4]

Because the plaintiffs have not told the court how they would identify the "chronically undercounted" census blocks, and because a state-wide class would not present common questions but rather, would join as plaintiffs parties with adverse interests, this court must deny plaintiffs' motion for class certification. The court accordingly turns to the defendants' motion to dismiss the case.

### 3. The Motion to Dismiss

■ The defendants advance three arguments in support of their motion to dismiss the complaint. First, that plaintiffs' claims are not ripe for review—the census not having been officially completed yet; second, that the plaintiffs present a non-justiciable, political question and; finally, that the plaintiffs lack standing to pursue this action.[5]

The court first notes that similar litigation pending in New York has led to the entry of a stipulation between the parties, pursuant to which the Census Bureau agreed to, and did, formulate guidelines which will direct its decision whether to conduct a statistical adjustment of the final census figures to compensate for the over- or under-counting of certain groups (essentially, the same groups the plaintiffs in this case seek to represent). After the Census Bureau issued its guidelines, the plaintiffs in the New York case went back to court, arguing that the Bureau was not in compliance with the stipulation. *See New York v. U.S. Dept. of Commerce*, 739 F.Supp. 761 (E.D.N.Y.1990). The district court held that a challenge to the census enumeration was justiciable and that the question whether the guidelines violated the stipulation was ripe for review. *See Id.* at 764–68. The court ultimately upheld the guidelines promulgated by the Census Bureau.

This court is not as certain as the district court in New York that the plaintiffs' challenge to the census presents a justiciable question. Before delving too deeply into the issues, the court notes the 'catch–22' presented by plaintiffs' arguments. The plaintiffs' claim, in part, is that the Census Bureau's failure to correctly count them leads to their inability to adequately represent themselves politically (the count is the basis, either by statute or in practice, for the apportionment of representatives at federal, state and local levels). Should this

in dormitories; Mississippi contests a count of its residents which indicates that the population increased by about 13,000, while jobs in the state increased by over 125,000. See Mitchell Locin, *Time's up, Census Bureau Says No Deadline Extension for Cities Efforts to Add to Count*, Chicago Tribune, Chicagoland Section, p. 3 (September 26, 1990).

4. The court recognizes that plaintiffs are not required to exactly specify the membership of their proposed alternative class. See *Marcial v. Coronet Insurance Co.*, 880 F.2d 954, 957 (7th

Cir.1989). Plaintiffs' allegations, however, are too vague to permit *any* principled evaluation of the class membership, and as a result the court cannot accept them.

5. The court notes that since this case arrived here, the Census Bureau has released preliminary population counts. See Exhibits A and B to Defendants' Response to Plaintiffs' Motion to Expedite (letters transmitting figures to President Bush and to the Illinois Governor and legislators).

court find that question to be a non-justiciable 'political' question, then plaintiffs will be left to their political remedy—a remedy they claim is not truly available to them, which is why they filed suit in the first place.

On the other hand, should this court vindicate plaintiffs' claims, then some other state or group of people will suffer. Just as this court could not certify a class of all Illinoisans because of the legitimate adverse interests of the various citizens of the state, so are the interests among the various states adverse. At least at the federal level, the upward 'correction' of the Illinois count can only harm one or more of the rest of the states. The House of Representatives has a fixed number of seats—435—which are apportioned, according to the census, among the states. If Illinois gains a seat, then another state *must* lose one—a 'zero-sum game'. Yet none of the other states, any one of which could be adversely affected by the outcome of this litigation and any one of which might also be undercounted, is a party here.

To further complicate the problem, the court has already noted that the Census Bureau is subject to litigation regarding the conduct of the 1990 census in at least one other jurisdiction. *See New York v. U.S. Dept. of Commerce,* 739 F.Supp. 761.[6] The adjudication of this case presents the very real and substantial risk of inconsistent judgments. The Census Bureau could very likely be required to do one thing in New York and quite another in Illinois. This does not bode well for the plaintiffs' stated goal of a more accurate census.

In *Carey v. Klutznick,* 653 F.2d 732, 737–38 (2d Cir.1981) (*Carey 3*) the Second

Circuit addressed some of these issues.[7] Although the district court had already decided (and the *Carey 2* panel affirmed) that the parties had standing and their claim about the conduct of the census justiciable, the *Carey 3* panel offered some alternatives which the district court might have (and, according to the *Carey 3* panel, should have) utilized. While the panel in *Carey 3* did not expressly criticize the *Carey 2* panel's opinion, it did note that the parties and the court could have accommodated the shared interest of the several states in an accurate enumeration in a number of other ways. The first was "to substitute Bureau and congressional review for that of the court." The second, "to require that notice of suit be given to all of the States, with permission to intervene given any State which felt that its interests were imperiled." Third, "to seek multidistrict coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Finally, the district court could have "stayed its judgment pending a definitive appellate ruling as to whether the Census Bureau's conduct of the ... census could properly be challenged in fifty separate and unrelated actions...."

The most attractive *judicial* resolution, from this court's perspective, would have been the referral of the matter to the Panel on Multidistrict litigation. But the court is not authorized to initiate proceedings to transfer cases. Only the panel itself or one of the parties to this or the New York action may do so. See 28 U.S.C. § 1407(c)(i) and (ii). No referral appearing to be forthcoming, this court must consider the other alternatives available to it.

---

6. Among the plaintiffs in that litigation are: the city of Chicago; the city of Los Angeles; Dade County, Florida; the National Conference of Mayors; the National League of Cities; the League of United Latin American Citizens; and the National Association for the Advancement of Colored People.

7. *Carey 3* was the last in a series involving a challenge to the 1980 decennial census. The plaintiffs charged mismanagement in the Census Bureau, leading to a significant miscount. The district court granted a preliminary injunction, requiring the Census Bureau to compare a

list of names submitted by the plaintiffs with its own records in order to identify individuals not counted in the 1980 census. *See Carey v. Klutznick,* 508 F.Supp. 416 (S.D.N.Y.) (*Carey 1*). The appellate court affirmed the injunction and held that the plaintiffs had standing to bring their claims and that they had presented a justiciable question. *Carey v. Klutznick,* 637 F.2d 834 (2d Cir.1980) (*Carey 2*). After the case returned to the district court, the court ordered the Census Bureau to adjust its population figures for New York. The Census Bureau appealed again, leading to the opinion cited above, *Carey 3.*

Another suggestion the panel in *Carey 3* made was that the district court order the parties to notify all of the States, and grant those with an interest in the litigation to intervene. That solution is not practicable here because, as the court noted, a court in at least one other state has already reached a partial resolution of the issue before this court—but more on that below. Enough to note here that the alternative is not practicable.

Accordingly, the court returns to the question with which it began—justiciability. Although alternatives were available to the parties which could have avoided a decision on that point, they have chosen not to take them and this court is therefore squarely confronted with the issue.

As the court noted above, the plaintiffs have presented the issue as a 'catch 22' (although not in those terms). In fact, however, that analogy is false. Even if plaintiffs' allegation that the groups they represent are not only "chronically undercounted", but are significantly less counted than other groups (see n. 3 above) is true, they are not left without any political remedy. There is no reason to believe that if these people are undercounted (and this court does not discount that possibility), the problem is unique to Illinois. Rather, any state whose residents include racial and ethnic minorities, documented and undocumented aliens, homeless people, people who do not read or speak English well, or people living in poverty or in high-crime areas, would likely suffer similar problems in obtaining an accurate count. The interests of many, if not all of these people, are represented to some extent in Congress.

Among the members of the House of Representatives are members of various racial and ethnic minorities as well as people from urban and rural high-crime areas. Furthermore, Congress has, in the recent past, addressed the problems faced by documented and undocumented aliens,[8] people who have difficulty with the English language,[9] and the homeless.[10] While an undercount is undoubtedly an evil to be avoided, it does not necessarily mean that the people who are not well counted are without any political remedy whatsoever.

Furthermore, the court notes that the only question before it is whether the Census Bureau is doing what it should in order to obtain the most accurate count practicable. No districts have been drawn, no benefits cut, no actual harm yet suffered by the plaintiffs. This is not a case where the plaintiffs have *lost* political representation, but rather one in which they *fear* (perhaps with some justification) the loss. The question is which of the coordinate branches of government is best equipped to deal with plaintiffs' concern.

The plaintiffs in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), presented concerns similar to plaintiffs', but they challenged a legislative districting plan, rather than the census. The *Baker* plaintiffs complained that the Tennessee legislature had diluted their right to vote by failing to reapportion legislative districts for almost fifty years—during which time the population of the state had nearly doubled and concentrations of eligible voters had shifted. The plaintiffs went to court with their claim that the legislature's inaction violated their constitutional right to equal protection of the laws, as well as their rights under the Tennessee constitution. Although the defendants argued (and the district court held) that plaintiffs had presented a non-justiciable, political question, the Supreme Court differed. In ex-

---

**8.** See, for example, 18 U.S.C. § 242, which provides: "Whoever, under color of any law, statute, ordinance, regulation, or custom, wilfully subjects any inhabitant [of the United States] to the deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien ... than are prescribed for the punishment of citizens, shall be fined ... or imprisoned ... or both...."

**9.** See 42 U.S.C. § 1973aa, setting forth, among other things, bilingual voting requirements and providing for voting assistance for blind, disabled or illiterate persons.

**10.** See, for example, the Homeless Assistance Act, 42 U.S.C. § 11301 et seq. (1990).

plaining its holding, the Court also examined and clarified the boundaries of the political question doctrine.

The court stated that:

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710.

After an extensive review of its prior cases dealing with the doctrine, the court reiterated that a political question is one which a coequal branch of government has or will decide[d]; or which presents the risk of embarrassing the United States government abroad, or causing grave disturbance domestically; or one which requires the court to "enter upon policy determinations for which judicially manageable standards are lacking." *Id.* at 226, 82 S.Ct. at 715. It cautioned that:

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

Although the Court has applied the *Baker v. Carr* 'political question' test in a number of cases since it decided that case, see e.g. *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1985), it has not altered the doctrine. It has also not applied that doctrine to a case in which the plaintiffs challenged the conduct of the census.

This case has nearly all the characteristics which the Supreme Court has held are hallmarks of non-justiciable political questions. First, and most importantly, the Constitution specifically delegates the census authority to the Congress.[11] Congress has delegated much of that Constitutional authority to the Census Bureau, which has, as this court has noted so far a number of times, made a number of policy decisions about how to achieve the best count practicable. Pursuant to the New York settlement, the Bureau has further agreed to evaluate a number of factors when it decides whether to adjust the census. While the Constitutional delegation of census authority to Congress does not *necessarily* take this case out of the courts' jurisdiction it is nonetheless an important factor to consider in evaluating whether the case, as a whole, is justiciable.

Furthermore, plaintiffs' complaint specifically invites the court to "enter upon policy determinations for which judicially

---

11. Article 1, § 1 provides: "All legislative Powers herein granted shall be vested in a Congress of the United States...." Section 2, clause 3 of the same Article states: "Representative and direct Taxes shall be apportioned among the several States which may be included within this union, according to their respective Num-

bers.... The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, *in such Manner as they shall by Law direct."* (Emphasis added).

manageable standards are lacking." As the court noted at the outset, the plaintiffs have requested that this court "second-guess" the Census Bureau's judgment about the proper manner in which to conduct the census. Everyone concedes that an accurate headcount is a goal, but not a practical possibility. That being the case, the question is how to most fairly adjust for the undercount.

This is purely a policy determination. The fact that some "statistical adjustment" may be called for does not make the resolution of the issue any easier. The parties agree, and indeed they are here because, there is no single, universally accepted statistical manipulation which will magically correct the census count. The choice of one statistical method over another must be made according to criteria which the judiciary is not best suited to evaluate. Each of the available methods has its own advantages and disadvantages and the body best equipped to choose one over the other is that which is vested with authority to decide policy—Congress, through the Census Bureau. That, perhaps, is why the Constitution specifically delegates the census authority to Congress, rather than the courts. Clearly, this case presents a nonjusticiable political question within the parameters set in *Baker v. Carr.*

In essence, what the plaintiffs are asking this court to do is to review, and modify, the settlement agreement approved by another district court. Even if this court were inclined to make the policy determinations the plaintiffs call for, it clearly is not authorized to act as an appellate court to another court of equal jurisdiction. This dilemma illustrates the inherent problems with allowing several (perhaps any) courts to consider the same or similar question as concerns a single defendant.

Plaintiffs had other options. They chose to forego them. This court finds that the questions whether and how the Census Bureau should adjust its 1990 census is nonjusticiable at this time. Furthermore, the risk that permitting this litigation to proceed would result in the imposition of inconsistent judgments upon the Census Bureau is an insurmountable obstacle to its continuance. Fed.R.Civ.P. 1 provides that the rules of civil procedure "shall be construed to secure the just, speedy, and inexpensive determination of every action." None of these three goals would be met by permitting this litigation to continue. This court therefore grants the defendants' motion to dismiss the complaint.

### 4. The Motion to Intervene

Finally, the State of Illinois has moved to intervene in the action. Because this court has granted the defendants' motion to dismiss the complaint, the court denies the motion to intervene.

### Conclusion

The court denies plaintiffs' motion for class certification, grants defendants' motion to dismiss, and denies the State of Illinois' motion to intervene.