STATE of Texas, et al.

v.

Robert MOSBACHER, Sr., Secretary of Commerce, et al.

Civ. A. Nos. B–91–018, B–91–155.

United States District Court, S.D. Texas, Brownsville Division.

Jan. 30, 1992.

Judith Sanders–Castro, Mexican–American Legal Defense & Educ. Fund, San Antonio, Tex., for Guadalupe Mena.

James C. Harrington, Texas Civil Rights Project, Austin, Tex., for Maria Gomez.

Judith Bagley, Austin, Tex., for Sulema Hernandez.

Judry L. Subar, Thomas W. Millet, Atty., U.S. Dept. of Justice, Civil Div., Washington, D.C., for Robert Mosbacher.

Thomas W. Millet, Judry L. Subar, Jason R. Baron, Attys., U.S. Dept. of Justice, Civil Div., Washington, D.C., for Barbara Bryant.

Dan Morales, Atty. Gen. of Tex., Renea Hicks, Sp. Asst. Atty. Gen., Mary Keller, Deputy Atty. Gen., Javier Guajardo, Sp. Asst. Atty. Gen., Austin, Tex., for State of Tex., Ann Richards, Debbie Irvine, Robert I. Kelly.

Richard L. Bilbie, Asst. Co. Atty., Cameron Co. Atty., Luis V. Saenz, Cameron Cty. Atty., Brownsville, Tex., for Lucino Rosenbaum, Jr., Mike Cortinas, Jr., Adolph Thomae, Jr., Tivia Valencia, Antonio Garza, Jr.

J.A. Canales, James F. McKibben, Jr., Hunt, Hermansen, McKibben & Barger, Nancy M. Simonson, Canales & Simonson, James R. Bray, City Atty., Corpus Christi, Tex., for the City of Corpus Christi.

## MEMORANDUM AND ORDER

VELA, District Judge.

On September 26, 1991, this court consolidated civil actions B–91–018 and B–91–155, and asked the State of Texas as well as the Secretary of Commerce to brief the question of what relief this court may grant plaintiffs assuming an impermissible census has been conducted. This Memorandum and Order considers this question as well as the standing of the individual plaintiffs and the class they seek to certify.

Much procedural activity has occurred in this case since its original filing on February 7, 1991. Plaintiffs included several individuals of hispanic descent living in the State of Texas (the vast majority of them in southern Texas) and the class they seek to represent consists of all "similarly situ-

310

ated persons of hispanic origin who live in discrete rural and urban areas of Texas characterized by high concentrations of chronically undocumented populations, a history of illegal ethnic/racial discrimination, economic disadvantage, and denial of equal participation in all levels of the state's political systems." The original plaintiffs alleged they are discriminatorily being deprived their right to elect members of the U.S. Congress, state representatives and senators, county commissioners, city council members and commissioners and school board trustees, because of the high proportion of uncounted class members.

Suit was brought against the Department of Commerce and an agency under it, the Bureau of the Census, the State of Texas and various other state and local officials and entities.[1] The State of Texas next filed suit against the Department of Commerce and the Bureau of the Census claiming a loss to its proprietary interest in federal funds caused by the census undercount and asserting its *parens patriae* standing to protect the interests of its citizens. This court consolidated the two suits, B–91–018 and B–91–155 on September 26, 1991, and made the State of Texas lead plaintiff. All the individual plaintiffs, the class they represent and the State seek a statistical adjustment to the census numbers.

Defendants have filed a motion to dismiss claiming that: I.) plaintiffs' claims are non-justiciable, II.) the State lacks *parens patriae* standing, and III.) this court lacks jurisdiction in a suit where a state is seeking money damages from the Federal Government. This court shall consider each of these arguments in turn.

## I. JUSTICIABILITY

Defendants maintain a political question exists and therefore this court lacks jurisdiction. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court outlined the scope of the political question doctrine.

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710. The defendants base their justiciability claim on these arguments: A.) the act of taking the Census has been committed to the Congress, a coordinate political branch of government, B.) the plaintiffs have no standing to challenge the census and C.) there is a lack of a judicially manageable standard.

### A. Commitment to a co-ordinate political department

■ Article I, § 2 of the U.S. Constitution states "[t]he actual Enumeration shall be made ... in such Manner as they [Congress] shall by law direct." The defendants claim Congress has ultimate authority over the census which was devised solely for the apportionment of representatives among the states and this is uniquely a political question because it determines the composition of the House of Representatives. Defendants further note the Congress permissibly delegated the responsibility for conducting the actual enumeration

1. This Memorandum and Order addresses this court's jurisdiction over the individual plaintiffs, their class, the State of Texas, the Department of Commerce and the Bureau of the Census and the Department of Commerce/Bureau of the Census' motion to dismiss. Therefore, it is unnecessary at this time to discuss the individual defendants whose status lies below that of the State of Texas. Unless otherwise stated, whenever this court refers to the "defendants," the Department of Commerce, or the Bureau of the Census, the court will be addressing the parties making the motion to dismiss.

(the census) to the Secretary of Commerce, *see* 13 U.S.C. § 141, but retained authority to alter the Secretary's methodology at any time.

The defendants point to the decision in *Tucker v. U.S. Dep't of Commerce*, 135 F.R.D. 175 (N.D.Ill.1991). In *Tucker*, the plaintiffs sought injunctive relief against the Census Bureau alleging that they have been "chronically undercounted." Included in the category of "chronically undercounted," were racial and ethnic minorities, aliens, homeless people, those not able to read or speak English well and those living in poverty or in high crime areas. The *Tucker* plaintiffs claimed their right to political representation at federal, state and local levels has been impinged and the entire state of Illinois is harmed because of the lost federal financial aid that would result from a census undercount. The plaintiffs wanted the Census Bureau to correct the census figures with "the most accurate correction methods available."

The *Tucker* plaintiffs requested a class consisting of all Illinois residents be certified since an undercount affects every resident of the state both financially and representationally.[2] The court found the class would consist of some persons whose interests are adverse to plaintiffs because a corrected census would harm rather than benefit them.[3] In the alternative, plaintiffs requested a class of residents of "census blocks in which the 'chronically undercounted' reside." *Id.* at 178. The court also rejected this because plaintiffs did not identify the census blocks consisting of the "chronically undercounted" which meant

there was a failure to properly define the class and therefore, no class was certified.

Although the *Tucker* court acknowledged the Eastern District of New York had found such a claim justiciable in *New York v. U.S. Dep't of Commerce*, 739 F.Supp. 761 (E.D.N.Y.1990), the *Tucker* judge disagreed and addressed the justiciability of plaintiffs' complaint.[4] His opinion stated, although the plaintiffs claimed they were significantly undercounted, this "class" of "chronically undercounted" individuals is not unique to Illinois and the "interests of many, if not all of these people, are represented to some extent in Congress.... While an undercount is undoubtedly an evil to be avoided, it does not necessarily mean that the people who are not well counted are without any political remedy whatsoever." *Tucker*, 135 F.R.D. at 180.

The *Tucker* court noted the *Baker v. Carr*, political question analysis has never been applied to a case involving the census by the Supreme Court. However, the court found this case to possess "all the characteristics which the Supreme Court has held are hallmarks of non-justiciable political questions." *Id.* at 181. Because the authority to hold the Census was specifically delegated to Congress, *see* U.S. Const. Art. I, § 2, and the plaintiffs' complaint invited the court to enter upon policy considerations which lacked judicially manageable standards, a political question existed and granted the Census Bureau's motion to dismiss.

This court not only is faced with a different procedural history than the one in *Tucker* but it also disagrees with some of

---

**2.** Financially because some federal programs allot monies according to census figures and representationally because the entire state's proportion of representation in the House of Representatives and number of electors who will elect the President of the United States are determined by the census.

**3.** Although the plaintiffs argued any objection to a "correct" census by any person or class of people would be illegitimate, the court still found certain "persons' interests [to be], legitimately, adverse to the plaintiffs'." *Id.* at 177. (Footnote omitted).

**4.** The *Tucker* court, looking to *Carey v. Klutznick*, 653 F.2d 732, 737–38 (2d Cir.1981) (*Carey 3*), felt this case should have been presented to a Panel on Multidistrict litigation or notice given to all states allowing them an opportunity to intervene as being superior avenues to proceed with a case such as this. The *Tucker* judge stated those two alternatives were unavailable because he did not have the authority to send the case to the Multidistrict litigation panel, and because a partial resolution of the case has been made in New York without all the states being involved, *see Tucker*, 135 F.R.D. at 179–80. Therefore, the judge went through a justiciability analysis.

that court's analysis. In the case at bar, the individual plaintiffs and their class have specifically identified themselves [5] and are complaining about the effect the 1990 census undercount will have on their representation on the federal, state and local levels [6] and the State of Texas has alleged a financial loss due to the under-count.

The *Tucker* court was correct when it noted the Supreme Court has not yet ruled on the existence of a political question when the census is at issue, however, it underestimated the unquestionable impor-tance of an individual's vote counting as much as another person's vote. In *Wesber-ry v. Sanders*, 376 U.S. 1, 8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964) the Supreme Court construed Article I, § 2 as requiring as is nearly "practicable one man's vote in a congressional election [ ] to be worth as much as another's." Similarly in *Karcher v. Daggett*, 462 U.S. 725, 732, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983) the Court stated "[a]s between two standards—equal-ity or something less than equality—only the former reflects the aspirations of Art. I, § 2." While it is true both of these cases involved state efforts at redistricting and not the act of conducting the census, there is no doubt that Article I, § 2 is implicated when a discriminatory census is alleged.

The Second Circuit addressed the politi-cal question issue in a case very similar to the one at bar in *Carey v. Klutznick*, 637 F.2d 834 (2d Cir.1980) (*Carey 2*). The *Car-ey 2* court found the Census Bureau's polit-

ical question argument inconsistent with *Baker v. Carr* and "[b]eyond this, appel-lees (the plaintiffs) assert a *substantial constitutional claim* and are not merely quibbling over office procedures utilized by the Census Bureau." *Id.* at 838. (empha-sis added). The individual plaintiffs in the case at bar are complaining about the dilu-tion of their vote and this is a fundamental constitutional right. *Baker v. Carr*, 369 U.S. 186, 207, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962).[7]

"In order to determine whether there has been a textually demonstrable commitment to a co-ordinate department of Govern-ment, [the Court] must interpret the consti-tution." *Powell v. McCormack*, 395 U.S. 486, 519, 89 S.Ct. 1944, 1963, 23 L.Ed.2d 491 (1969). In *City of Philadelphia v. Klutznick*, 503 F.Supp. 663 (E.D.Penn. 1980), the district court faced with the iden-tical question found no reason why "sepa-ration of powers should forbid the courts from reviewing the conduct of the census." *Id.* at 674. The Constitution granted to Congress the exclusive power to determine the *manner* in which the enumeration would take place, however, there is no indi-cation the Framers intended Congress' ac-tions to be non-reviewable. *City of Willa-coochee v. Baldridge*, 556 F.Supp. 551, 557 (S.D.Ga.1983).

### B. Standing

■ In order to bring suit the plaintiff must have standing. Three criteria must be met to challenge agency action: [8] (1) the

---

**5.** Because this Memoranda only deals with the questions of jurisdiction and standing and be-cause a class has not yet been certified, it will be assumed for the moment a proper class has been identified.

**6.** Texas mentions this in its memorandum in response to the government's motion for dismis-sal, however, it does not claim any such viola-tion in its pleadings. Although there is such a possibility, this court is not presented with nor does it rule on the issue.

**7.** The right to vote is "a 'fundamental political right' that is 'preservative of all political rights.' *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 [ (1886) ]. The rights of expression and assembly may be 'illusory if the right to vote is undermined.' *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11

L.Ed.2d 481 [ (1964) ]." *Williams v. Rhodes*, 393 U.S. 23, 38–39, 89 S.Ct. 5, 14, 21 L.Ed.2d 24 (1968) (J. Douglas concurring).

**8.** 13 U.S.C. § 141(a) reads:

The Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the "decennial census date", in such form and content as he may determine, including the use of sampling procedures and special surveys.

The Secretary has delegated much of his rule making responsibility to the Director of the Cen-sus, U.S. Dep't of Com. Dep't Organization Order 35–2A (July 22, 1987), who is the head of the Bureau of the Census, *see* § 21, and the Bureau is an agency under the direction of the Depart-

complained of action must result in injury-in-fact to the plaintiffs, *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 73, 78–81, 98 S.Ct. 2620, 2630, 2633–34, 57 L.Ed.2d 595 (1978), (2) the plaintiffs must fall within the zone of interest the statute was designed to protect, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), and (3) there must be no statutory prohibition of judicial review. 5 U.S.C. § 701(a). *See also American Medical Ass'n v. Bowen*, 857 F.2d 267, 272 (5th Cir.1988). However, when considering whether a complaint provides the plaintiffs with standing, "both the trial and reviewing courts must accept as true all material allegations of the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

### (1) Injury-in-fact

■ If the plaintiffs are to show an injury which is actionable in a federal court, there must be more than an academically possible or hypothetical harm; plaintiffs must show they are currently being harmed or are in immediate danger of sustaining a direct injury as a result of the challenged conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). However, not only must an injury exist, it must be casually connected to the challenged conduct such that relief granted by the court would redress the claimed injury. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. at 78, 98 S.Ct. at 2633. Plaintiffs' claims advance two major lines of argument. The first is loss of representation. The second is the loss of federal funds, the distribution of which is based upon the census figures.

■ As this court previously noted, the right to vote is fundamental to American society, *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Wesberry*

v. *Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), and as such, its deprivation or the dilution of an individual's vote would constitute injury-in-fact. *Baker v. Carr*, 369 U.S. at 207–208, 82 S.Ct. at 705; *City of Philadelphia*, 503 F.Supp. at 672. If the census undercount is found to be of an impermissible character, then the plaintiffs who have alleged that their voting rights have been interfered with by the undercount have shown the necessary nexus between their complaint and the improper agency activity.

■ Likewise there is a nexus between some of the federal funds Congress gives to the states and the census figures. Many federal programs disburse funds based upon population. While some programs mete out funds based on straight population figures, "numerous federal programs target particular groups; and often these target groups tend to cluster in urban and/or minority areas." *City of New York v. U.S. Department of Commerce*, No. 88 Civ. 3474 slip op. at 8 (E.D.N.Y. Sept. 19, 1991).

Notwithstanding the defendants' claim the injury is too speculative and relief will not result from an alteration in the census figures, "[i]t is far more 'speculative' that the use of data will be eliminated than that it will be continued." *City of Philadelphia*, 503 F.Supp. at 671; *compare Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 43–44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976) (simply requiring the Internal Revenue Service to reinstate the requirement for tax-exempt status that hospitals must operate within their financial ability to serve those unable to pay for those services MAY NOT result in hospitals providing more services to poor; the hospitals may decide to relinquish favorable tax status to avoid the financial burdens of assisting the indigent.) While the Census Bureau and the Department of Commerce are not in charge of

---

ment of Commerce. *See* § 2. Therefore, action taken by the Bureau may be viewed as agency action.

distribution of federal funds, the Bureau's actions significantly affect the distribution of funds [9] and therefore satisfies the requirements for injury in fact. *See City of Willacoochee,* 556 F.Supp. at 554.

The State of Texas, however, has not asserted through its pleadings a direct injury and therefore, does not have standing as a recipient of federal funds. In *Carey 2,* 637 F.2d at 838, the State of New York alleged direct loss due to revenue sharing funds.[10] Although citizens of Texas may suffer a direct injury because of this, the State of Texas will not suffer in this same direct way. Absent an allegation of a direct loss, the State does not show injury-in-fact.[11] The claimed loss of federal funding will only be actionable against the United States if it was brought by plaintiffs who could show an actual direct loss of funds due to an undercount.

### (2) Zone of interest

The next step in our standing analysis is to determine whether a particular statute was designed to protect the plaintiffs. 5 U.S.C. § 702. The plaintiffs satisfy this requirement if their interests are arguably within the zone of interests that the statute in question was intended to protect or regulate. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. at 153, 90 S.Ct. at 830. If the plaintiffs are only incidental beneficiaries of the census then they fall outside of the statute's and its attendant regulations's zone of interest. *See Moses v. Banco Mortgage Co.,* 778 F.2d 267, 271 (5th Cir.1985).

The statute authorizing the Secretary of Commerce to conduct the census, 13 U.S.C. § 141, "expresses the intent of Congress that census data be collected not only for reapportionment purposes but also for the accurate distribution of funds." *See City of Willacoochee,* 556 F.Supp. at 555.[12] The zone of interest of § 141 includes anyone with an interest in fair reapportionment, which constitutionally concerns all citizens, and those with an interest in the fair distribution of the funds. The individual plaintiffs and the class [13] all fall within the zone of interest which Congress sought to protect with the enactment of the statute.

### (3) Judicial review

5 U.S.C. Chapter 7 [14] applies when reviewing agency action except if (1) the statute precludes judicial review; or (2) the agency action is committed to agency discretion by law. Section 701(a). From a

---

**9.** 13 U.S.C. § 141(e)(1) states:

> If—
>
> (A) in the administration of any program established by or under Federal law which provides benefits to State or local governments or to other recipients, *eligibility for or the amount of such benefits would ... be determined by taking into account data obtained in the most recent decennial census,* and
>
> (B) comparable data is obtained in a mid-decade census conducted after such decennial census,
>
> then in the determination of such eligibility or amount of benefits *the most recent data available* from either the mid-decade *or decennial census shall be used.* (emphasis added).

The statute envisions the use of the census figures in disbursements and in fact are used in many programs. *See City of New York v. U.S. Department of Commerce,* No. 88 Civ. 3474 slip op. at 8–9 (E.D.N.Y. Sept. 19, 1991) (Showing reliance of federal programs such as Headstart, 42 U.S.C. § 9831 *et seq.,* Maternal and Child Health Services Block Grant, 42 U.S.C. § 701 *et seq.,* and the Highway Planning and Construction programs, 23 U.S.C. § 104(b)(6), on census figures. Furthermore these programs aim funds at specific segments of the population and are not contingent upon a given states' proportion of the entire national population.)

**10.** Revenue sharing funds entitled a state to federal monies based upon population. Though the money was for the benefit of all the citizens of the state, the program directed the resources to the state government to use as it deemed fit.

**11.** This does not necessarily mean the State CAN NOT bring suit in its *parens patriae* capacity, however, this court will not make that finding at this time, under these circumstances.

**12.** See text of 13 U.S.C. § 141(e) at footnote 9.

**13.** Texas's *parens patriae* standing will be addressed later. However, because this court refuses to find *parens patriae* standing or standing in its own right, it does not matter now if the State of Texas is within the zone of interest of the statute.

**14.** The Judicial Review section of the Administrative Review Act (the "APA").

reading of the Census Act, there is no statutory provision explicitly prohibiting judicial review of the Bureau's actions. In determining whether or not Congress has committed certain actions to agency discretion, it is important to note "only upon a showing of 'clear and convincing' evidence should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *Amberg v. Federal Deposit Insurance Corp.*, 934 F.2d 681, 684 (5th Cir.1991).[15]

In *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988), the Court ruled the APA precluded judicial review of the Central Intelligence Agency Director's employment termination decisions made pursuant to § 102(c) of the National Security Act, 50 U.S.C. § 403(c) because the decision was committed to the Director's discretion. The Court further noted that when Congress desires to preclude judicial review of Constitutional claims, its intent must be clear. *Id.* at 603, 108 S.Ct. at 2053. "We require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* at 603, 108 S.Ct. at 2053. The Census Act does not purport to restrict judicial review and furthermore, the impairment of plaintiffs' right to an undiluted vote may not be foreclosed from judicial review by operation of the Administrative Procedure Act.

C. Judicially manageable standard

▮ Defendants would have this court believe there are no standards to follow when "determining whether or when a statistical adjustment to the census headcount is necessary or appropriate ... [a]djudication would require the Court to impose its view of competing statistical theories and methodologies as a matter of constitutional law, even though the Constitution itself provides no guidance." Defendants' Memorandum at 9–10, November 13, 1991. This argument misses the issue at question. This court has been asked to decide whether a census undercount has impermissibly denied the individual plaintiffs and the class they represent, their fair share of representation. It is a disservice by the defendants to suggest that this court should not hear this case because it has no expertise evaluating "competing statistical theories and methodologies." The federal courts have a very long history of qualifying expert witnesses and deciding cases based upon the testimony of those experts and should not refuse to hear a proper case simply because it is "difficult."[16] If such were the case, then many federal judges would be unable to make decisions in complex patent litigations, *e.g. I.U. Technology Corp. v. Research–Cottrell, Inc.*, 641 F.2d 298 (5th Cir. Unit A 1981), or make rulings on statistical presentations concerning redistricting, *e.g. East Jefferson Coalition v. Parish of Jefferson*, 926 F.2d 487 (5th Cir. 1991) or desegregation, *e.g. Taylor v. Ouachita Parish School Board*, 648 F.2d 959 (5th Cir. Unit A 1981). Manageable judicial standards are not concerned with how much homework the court will be required to do, rather the term only seeks a legal standard by which a court may measure the governmental action.

Article I, § 2 of the Constitution already has a standard to apply to redistricting cases and that standard seeks distributions of population which are as "accurate as practicable." *Wesberry v. Sanders*, 376 U.S. at 7–8, 84 S.Ct. at 530; *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); *Carey 2*, 637 F.2d at 839. Although defendants claim they have

---

15. It is recognized that when agency discretion has been delegated to an agency by Congress, this court has no power of review. However, that only occurs in specific "rare instances" where there is no law to apply and therefore, no meaningful standard against which to judge the agency's exercise of discretion. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

410–11, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (The Court did find statutory language calling for construction where no "feasible and prudent alternative" existed provided a sufficient legal standard to permit judicial review.)

16. *See* Fed.R.Evid. 702, 706 and advisory notes.

decided against altering the census,[17] this by itself does not deprive this court of reviewing the record. In the review, 5 U.S.C. § 706[18] supplies an adequate standard.

## II. PARENS PATRIAE

■ The defendants claim a state may not sue the federal government in its *parens patriae* capacity by citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). In a footnote the Court stated "[a] State does not have standing as *parens patriae* to bring suit against the Federal Government," *Id.* at 610 n. 16, 102 S.Ct. at 3270 n. 16, *citing Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). It is not clear how definitive this assertion is, however. The statement was made in light of a case which did not raise the issue of whether a state might have *parens patriae* standing when bringing suit against the United States.[19] In fact *Mellon*, the case which the footnote relied on for its authority, stated "[w]e need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress." *Mellon*, 262

U.S. at 485, 43 S.Ct. at 600.[20] The Eleventh Circuit was faced with deciding a state's capacity to sue in a *parens patriae* capacity and recognized *Alfred L. Snapp* did not decisively deal with the question. *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir.1989). The *Chiles* court declined to rule on the issue because it felt the case was not a proper one with which to break new ground.[21] Although the situation presented by the case at bar may be a more appropriate one than that in *Chiles*, this court, like the Eleventh Circuit, can see no prejudice to the State of Texas in denying it standing since the individual plaintiffs and the class will in all likelihood resolve the State's concerns,[22] and therefore, declines to find that the State of Texas may sue under in its *parens patriae* capacity.

## III. MONEY DAMAGES AGAINST THE FEDERAL GOVERNMENT

Since the State of Texas no longer has standing as a plaintiff, this court need not consider whether Texas was suing for money damages or specific relief.

## CONCLUSION

Based upon the foregoing discussion, this court hereby asserts jurisdiction as to

---

**17.** The Secretary announced his determination on whether to statistically alter the census on July 15, 1991. 56 Fed.Reg. 33582 (July 22, 1991). The decision recognized the problems inherent in trying to take a census in a nation as large as the United States and the potential for undercounts. There was also noted division in the statistical community concerning how and if the census could be corrected. It finally decided it was unclear whether adjusting the census would improve the census' accuracy or even add new distortions.

**18.** Section 706 Scope of Review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

　　·　　·　　·

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

**19.** *Alfred L. Snapp* involved Puerto Rico bringing suit in its *parens patriae* capacity against private sector defendants for alleged violations of federal law; the United States was not a defendant in this suit. After finding Puerto Rico could maintain suit in its *parens patriae* capacity a panel of four justices stated states do not have *parens patriae* standing against the Federal Government.

**20.** The *Mellon* court, however, also stated citizens of a state are also citizens of the United States and the Federal Government has a superior right to represent them in a *parens patriae* capacity. *Mellon* at 485–486.

**21.** *Chiles* challenged the federal government's operation of the Krome Detention Center in Dade County, Florida. The court felt the asserted injury was not felt by the state as a whole but rather only by Dade County. Because there was a finding that Dade County would have standing, there would be no prejudice in denying the state its standing. *Chiles* at 1209.

**22.** If the individual plaintiffs and their class prevail and an adjustment is made in the census figures, in all likelihood, all of the State's complaints should be redressed.

a suit between the individual plaintiffs, the class they represent and the Department of Commerce/the Bureau of the Census.

Accordingly, it is hereby ordered that:

1.) Defendants motion to dismiss is DENIED as to the individual plaintiffs and their class.

2.) The State of Texas be allowed *leave to amend its pleadings* to conform their standing as herein decided and is GRANTED ten (10) days from receipt of this order to do so if it so desires. If the State of Texas does not so amend its pleadings, defendants' motion to dismiss will be granted as to the State of Texas.

As herein discussed, this court has found the question before it justiciable and the existence of a group of proper plaintiffs. Since the actions of the defendants are reviewable, it follows that this court may decide whether certain decisions and actions conform to the APA and the Constitution. The court need not spell out what shape any relief will take, if any in fact is needed, at this time because there is no record before it which would allow it to venture such speculations.

In order to better grasp the length and extent of the necessary hearing which this court will be holding, including an appraisal of the amount of records and testimony to be presented, this court orders a pre-trial conference.